*691
 
 BRUNOT, J.
 

 This is a suit for the rescission of an oil and gas lease, for attorney’s fees, and for the reservation of plaintiff’s right to sue for damages.
 

 From a judgment canceling the lease, awarding plaintiff $250 and legal interest thereon, as attorney’s fees, ánd fixing a time limit for the removal of defendants’ property from the leased premises, the Texla-Coastal Oil Company, Inc., has appealed.
 

 Plaintiff leased to defendant Booker certain land in Calcasieu parish, La., for the sole purpose of drilling thereon for oil and gas.
 

 Booker assigned the east half of the acreage leased by him to E. E. McFarland, and the west half to the Coastal Oil Company. McFarland transferred his lease to W. D. Gordon, and the Coastal Oil Company reorganized and became the Texla-Coastal Oil Company, Inc.
 

 Plaintiff’s petition alleges a breach of the terms of the lease, and the Texla-Coastal Oil Company, Inc., alone made a defense. The defense presents only one question for decision, to wit: Did the drilling of two wells by the Texla-Coastal Oil Company, Inc., on the west half of the leased lands, reserve from forfeiture, under the facts of the case and the provisions of the lease, a five-acre tract of land around each of said wells?
 

 The provisions of the lease relied upon are as follows:
 

 “(a) Witnesseth: That .the said lessor for and in consideration of the obligations herein assumed, and other good and valuable considerations, receipt of which is hereby acknowledged and of the covenants and agreements hereinafter contained on the part of the lessee to be paid, kept and performed, has granted, demised, leased,” etc.
 

 “(b) It is agreed that this lease shall remain in full force as long as lessee, his successors and assigns, complying with the obligations hereinafter made, and after oil or gas is produced, then as long as oil or gas, or either of them, is produced in paying quantities from said land by the lessee, his successors or assigns.
 

 “(c) The consideration of this lease is the absolute and unconditional obligation on the part of the lessee to commence the actual drilling of a well in search of oil and gas upon the tract of land herein described, within 10 days from the date of this lease, and to continue said operation diligently and continuously until a depth of at least 4,000 feet is reached, unless oil or gas is found in paying quantities at a lesser depth.
 

 “(d) It is further, stipulated that in the event a paying well is brought in upon that property, lessee is obligated to prosecute the development of the said tract of land diligently for the development of oil or gas; it being understood that a new well shall be commenced within 60 days from the completion or abandonment of the former well, and to continue thus until a total of 8 wells shall have been drilled on said above-described land.
 

 “(e) It is further stipulated and agreed that the lessee shall drill offset wells to all paying oil wells brought in within 150 feet of any one of the boundary lines of the property herein leased.
 

 “(f) It is further understood that there shall be saved from forfeiture 5 acres for each of said wells drilled and that if this lease is forfeited as to any land, 5 acres for each well drilled shall be saved from forfeiture, to be selected by the lessee, his heirs or assigns.
 

 “(g) In the event the well, stipulated for above, shall result in a dry hole, or be lost for any reason, then the lessee, his heirs or assigns, shall have the right to commence a second well, if same is commenced within 60 days from the completion or abandonment of first well, and drill same under the same conditions, and in the event it is a dry hole, or is lost for any reason, then lessee, his heirs or assigns, shall have the right to make as many attempts to drill as he desires, provided that not more than 60 days shall elapse from the completion or abandonment of the former well to the beginning of the next subsequent well.
 

 “(h) It is understood, stipulated and agreed that the failure on the part of the lessee to carry out any of the above conditions shall result in the ipso facto forfeiture of any and all rights granted to him in this lease, subject to the reservation,of 5 acres for each well drilled, as hereinabove stipulated.
 

 “(i) It is distinctly understood and agreed, however, that the lessee,'his heirs or assigns, shall have the right to drill as many more wells on said land as he chooses, after drilling the 8 wells hereinabove described, and nothing in the lease shall prevent the lessee, his heirs or
 
 *693
 
 assigns, from drilling as many wells as lie chooses on any or all, 5-acre tracts that are above reserved from forfeiture, in the event that this lease becomes forfeited as to any of the land covered by it.”
 

 The testimony shows that the first weE was drilled to a depth of 3,075 feet. When it came in, and for a short time thereafter, it produced about 60 barrels of oil per day. The production suddenly declined, and for approximately 6 months it produced about 20 barrels of oil per day. The well was then deepened to 3,400 feet, but no oil was found at that depth, and the well was abandoned.
 

 The second well drilled came in as a gusher. It produced about 400 barrels of oil per day for 3 or 4 days, at which time it choked up with sand and thereafter, for about 4 months, as a pumper, it produced about 20 barrels of oil per day when the pump was run during the day only,'and about 40 barrels per day when the pump was run continuously, both day and night. This ’well then sanded up and ceased to produce any oil, and thereafter defendant made no effort to wash it out or bring back production.
 

 It is the essence of the contract that oil or gas be produced in paying quantities, and that the lessee shall continuously exercise due diligence to that end. If production is secured and maintained, the landowner profits; otherwise he would receive nothing. There is no consideration named in the lease for the right to reserve a part of the leased land from forfeiture. That right is predicated upon the theory that oil or gas will be produced in paying quantities. It is only from this source that the landlord can receive compensation for the use of his land. It is therefore a condition precedent to the recognition of that right that it be proven that the wells drilled by defendant did, and that appellant has used due diligence to cause them to continue to, produce oil or gas in paying quantities. If this was not true, the contract would be without any consideration whatever, or a nudum pactum.
 

 All of the testimony offered to show that the wells drilled by defendant produced oil in paying quantities is merely estimates made by Mr. 1-Iook and Mr. Hardy. There are no exact figures and no books showing the daily production of the wells. The evidence discloses that in order to get a production of 20 barrels of oil per day from the first well drilled, during the 6 months, or the life of that well, it was necessary to burn 10 barrels of oil per day and to pay $5.60 per day for the cost of labor in operating the pump. There was an additional cost for treating this oil and taking the basic substance from it before it could be let into the pipe line, but the cost of this operation is not mentioned in the testimony. When these operations were completed, a part of the oil sold for about $1.25 per barrel, a part for $1 per barrel, and a part for $1.50 per barrel. The testimony simply shows the time these prices prevailed, but it does not give the quantity of oil sold at any particular price!
 

 There are several letters in the record which show that appellant complained about the production of the well, known as Hunter No. 1, and admitted its inability to make this well a paying one.
 

 From the evidence in the record we are convinced that this well was never a paying proposition, and that it was finally abandoned as a dry hole.
 

 The second well, known as Hunter No. 2, came in as a gusher, but it sanded up in 3 or 4 days, and the evidence does not disclose that appellant made a reasonable effort to clear the well and increase its production. It was pumped for about 4 months, and it produced about 20 barrels of oil per day during that time. It then choked up with sand and produced no oil at all. Appellant made no effort thereafter to reclaim this well, and no offset wells were drilled. There was no pro
 
 *695
 
 duction from either well and no effort was made by appellant to produce oil or gas from the land leased for more than one year prior to the institution of this suit.
 

 The record discloses that the appellant is virtually a bankrupt. It has no means whatever with which to develop the land leased, and, as the District Judge correctly says:
 

 “Production as well as development having stopped on the lease for more than a year, the required number of wells not having been put down by the lessee, and no effort having been made to protect lessors’ interests, on account of the Gulf’s well located so near the boundary line of the lease, it is evident that the lease is forfeited, according to its plain terms.”
 

 Por these reasons, the judgment appealed from is affirmed, at appellants’ cost.