HIGGINS, Justice.
 

 This is a suit by the lessors against the lessee to rescind and cancel from the public records an oil, gas, and mineral lease covering 40 acres of land in the Pine Island Field of Caddo Parish.
 

 The plaintiffs claim that the defendant has forfeited the lease because of its failure to fully develop, under the implied obligations of the lease, the leased premises for their mutual benefit, in accordance with the new and successful methods of development used by others in this chalk rock stratum oil field.
 

 The defendant contends that it had developed the land according to its obligations under the lease; that, in the alternative, it had not been placed in default; and that it should be granted time within which to drill additional wells.
 

 There was judgment rescinding the lease and ordering its cancellation.
 

 The defendant has appealed.
 

 The record shows that the lease covering 40 acres of land or the NEj4 of the NEJ4. Section 27, Township 21 North, Range 15 West, was granted on April 13, 1923 and that it was for a term of one year. The consideration was $3,500 cash and $3,000 was to be paid out of one-half of the first oil produced. The lease contained the implied covenant that the lessee would develop the leased premises according to the .recognized custom and progressive practices among the operators in the field. There were two old wells of a depth of about 2400 feet in the Woodbine sand formation on the property in 1923 when the lease was entered into, and after tnese Woodbine wells ceased to produce they were plugged back and perforated or. ripped at the chalk rock level, which is about 1650
 
 *330
 
 feet deep. Thereafter, one of the wells produced and the other failed on account of salt water. Later, the lessee drilled four successful chalk rock wells on the premises, the last of which was drilled in 1928. At the time this suit was filed, there were five pumper wells on the land which produced a little over ten barrels of oil per day, or two barrels each per day, as a result of the development prior to 1929.
 

 The Pine Island oil field is located in Caddo Parish and has an area of approximately 15 square miles or 9600 acres, which is divided into units of 40 acres each, and therefore, there are about 240 divisions in this territory. This is an old field which has- been producing oil for twenty-five or thirty years. When it was first developed the oil was produced from the Woodbine sand at a depth of 2400 feet, but this reservoir became so greatly depleted in 1920 that the operators plugged and cemented the wells and perforated most of them in the chalk rock formation at 1650 feet. About three years ago a new and modern method of developing old leases profitably was employed by other operators in the field. It consisted of drilling new wells into the chalk rock formation deeper than theretofore, and after using fresh water in the drilling operations, the wells were acidized. The results were very favorable.The acidizing process was also tried on the old wells and while it temporarily improved some of them, the method did not prove to be as successful as in the case of new wells. It appears that some 300 hew wells in the chalk rock formation in Caddo Parish have been brought in on a profitable basis through the deeper drilling and acidizing process.
 

 The Gulf Refining Company, the Magnolia Petroleum Company, the Texas Company and the Stanolind Oil Company have been for more than two years using this new method -and steadily drilling new wells in this chalk rock area. Some of their leases adjoin the lease involved herein.
 

 R. D. Cooper, production foreman of the Texas Company, testified that his company, during 1941, drilled two new wells on the Raines lease which is immediately west of the Lane-Wadkins lease in question; that 'there had been six old wells on this 40 acre tract of land producing about twelve barrels of oil per day or two barrels each,. and that one of the new wells produced seventeen barrels of oil a day and the other five barrels per day; that his company had drilled thirty-five new wells in the Pine Island Field in the chalk rock formation; that all of these wells were, drilled under old leases which had been drilled several years before in both the Woodbine sand and the chalk rock; that his company had done this extensive drilling without getting a dry hole; that he did not know of any dry holes having been drilled by others in.the field; and that this indicated that the chalk rock formation was uniform throughout the Pine Island Field, except in some places the formation was tighter than in others.
 

 Dr. A. F. Crider, who formerly served as the Chief Geologist of the Atlas Oil Company and the Dixie Oil Company, as the Assistant State Geologist of Kentucky;
 
 *331
 
 as the State Geologist of Mississippi and as Geologist with the Governmental Geological Survey, testified that the chalk rock formation is uniform throughout the’entire Pine Island Field; that he did not know of any dry holes having been drilled in that formation; that he was familiar with the field since 1920; that good oil field operating practice in the Pine Island Field definitely required, at this time, the drilling of new wells to a greater depth in the chalk rock formation with fresh water and acidizing them when they are brought in; that this new method of drilling and treating the wells has been so successful and profitable to the major companies, that they have engaged in extensive drilling on old leases in the Pine Island Field; that the Magnolia Oil Company has drilled, with this new process, as many as sixteen new wells; that it began these re-drilling operations about three years ago when the old production had gone down to a small barrelage per day per well; that the first well drilled came in making two hundred barrels of oil daily, and that one of the new wells has produced over one hundred thousand barrels of oil up to the present time; that some of the wells paid for themselves within four months; that he was of the opinion that it would be a profitable operation for the lessee to drill four additional wells on the 40 acres of land involved, using the new process, at a cost of about $5,-500 for each of the wells; that his opinion was based on the fact that major oil producers, whose leases were adjacent to and in the vicinity of the lease involved herein, had profitably developed their wells through drilling with the modern method; that there are three new wells on the lease to the east of this 40 acres, and two new wells on the lease to the south of the lease in controversy; that there are seven new wells on the Texas Company’s Raines lease immediately to the west; and that there are new wells producing oil on the Tholl Oil Company, Inc.-Logan lease immediately to the north.
 

 E. W. Sutherlin of the Production Department of the Gulf Refining Company stated that in December 1940, and January 1941, the Gulf Refining Company drilled four new wells on the Gulf-Wadkins lease, which covers the 40 acres described as the SWJ4 of the SE14, Section 22, Township 21 North, Range 15 West; that these new wells were producing one hundred twelve barrels of oil per day at the time of the trial of this case; that the operations were both successful and profitable; that five old wells on this same 40 acre tract, which lies diagonally to the northwest of and has a common. corner with the Lane-Wadkins lease here involved, were producing fifteen barrels of- oil per day or three barrels of oil each; that the Gulf Refining Company drilled four new wells on the Herndon lease which is about one mile north of the lease involved herein and that the new wells were making one hundred eight barrels of oil per day, whereas, the three old wells on that property were only producing twelve barrels of oil per day; that the Gulf Refining Company also drilled two new wells on the Tyson lease, which is about one-half mile from the Herndon lease, and that these two new wells are producing about one hundred twenty barrels of oil per day; that he agreed with Dr. Crider
 
 *332
 
 that it was not customary to rework the old wells or to kill them but to drill new wells deeper in the chalk rock formation with fresh water and then acidize the new wells'; and that while this acidizing process worked satisfactory on the new wells, it proved only temporarily effective on old wells.
 

 William H. Wadkins, one of the plaintiffs, testified that he was an heir of the original lessor, in 1923, and that he owned a 9/20th’ royalty interest in the whole of the Lane-Wadkins lease involved herein; that this royalty amounted to $18 per month, whereas, his 9/10th royalty interest from the Wadkins-Gulf lease (which is twice the amount of his holding in the lease in question) lying diagonally to the northwest where the Gulf Refining Company has drilled four new wells — is $600 per month, or, in short, that he gets $18 per month from the lease involved in this suit, and $300 per month for the same proportionate interest from the Gulf-Wadkins lease, and that both of these leases cover 40 acres of land.
 

 Mrs. Effie W. Nixon, also one of the heirs of the original lessor and who owns a l/20th interest in the Lane-Wadkins lease in controversy, states that she received royalties from that lease in the sum of $2, $1.96 and $2.18 respectively, for the past three months; and that on the other hand, for the same period of time, she received from the same proportionate royalty interest in the Gulf-Wadkins lease, $100.94, $63.-01 and $70.96, respectively.
 

 The plaintiffs also introduced in evidence certain testimony identifying the Logan lease covering 40 acres of land lying immediately north of the 40 acre tract involved herein, which lease was the subject of an action to cancel and erase it in the case entitled Logan v. Tholl Oil Company, 189 La. 645, 180 So. 473. It was shown that since the Logan lease was forfeited by the Court’s decree, Logan again leased the mineral rights above a depth of 2500 feet for a new consideration — that he be paid his royalty on the basis of a minimum of two hundred fifty barrels per month — and the mineral rights under the depth of 2500 feet, for a consideration of $4,000 cash.
 

 The defendant then placed its case before the court. H. N. Spofford, an expert geologist, stated that while he was not a graduate of any geological school, he had been a consultant geologist with twenty years experience, fourteen of which were spent in practicing his profession in Caddo Parish; that the chalk rock formation in the Pine Island Oil Field is an erratic zone of porosity, varying from lease to lease; that it could not be reasonably said because you get a good well on one of the 40 acres that you could do so on another 40 acres; that there are spots in the Pine Island Oil Field which do not have any oil wells; that he was familiar with the modern practice of drilling new wells and acidizing them and that this acidizing process worked very satisfactorily on new wells but not on the old ones; that from a geologist’s standpoint, he could not say definitely if four new wells were drilled on the lease in question that production would be certain; that the fact that other surrounding producers had been successful would prompt the les
 
 *333
 
 sors to be interested in endeavoring to get new production and that he could not find any fault with their position in the case as he would do likewise, if he were the lessor; and that whether an operator would be willing to make further investment would depend upon how favorable his chances of getting a profitable production so as to recover his investment.
 

 B. T. Harrington, superintendent of production of the Arkansas Fuel Oil Company, testified as to his experience with chalk rock formations, and stated that there are usually four wells to a 40 acre lease, but, on cross-examination, he admitted that he was talking about wells in the Caddo Oil Fields some 8 or 10 miles from the leased property involved here.
 

 J. E. Parker, production foreman of the Ohio Oil Company, testified that the Pine Island Oil Field was developed originally in the Woodbine sand and after the depletion of that oil supply, the wells were plugged back and brought into the chalk rock formation and averaged four wells to the 40 acres and the wells produced on an average, by pump process, of two barrels of oil each per day.
 

 A. G. Tullos, production foreman of the Tholl Oil Company, testified along the same lines as Mr. Parker.
 

 . W. P. Wilson, manager of the Indiana Corporation, and its agent in the State of Louisiana, testified that the lease had been properly developed for the production of oil; that the lease produced 3,340.10 barrels of oil in 1939, 3,803.72 barrels in 1940, 296.78 barrels in January 1941 and 339.77 barrels in February 1941; that oil sold for $1 per barrel and, therefore, on a production of 4,000 barrels per year there would be a gross return of $4,000; that on this basis plaintiffs were receiving $500 royalty or l/8th of'$4,000, or $12.50 per acre, per year, for each of the 40 acres; that' the defendant received $3,500 per year and that its operating expense amounted to $1,500, or that it received a net annual income of $2,000 per year; that his company had been sued for failure to develop the Goodwin lease in this Pine Island Field covering 37 acres of land and it had to surrender 30 acres thereof and that it retained 7 acres with its only well which was an old pumper; that the other 30 acres were transferred to another party who had already drilled a new producing well and had obligated himself to drill two more wells thereon; that the defendant company, since obtaining the lease in 1923' had never fully recovered its initial investment ,in drilling the new wells and developing and operating the old ones; that it would not be a profitable investment from the lessee’s standpoint to drill additional wells; that if the new wells did not produce any better than the old ones, it would take the lessee about twelve years to recoup the amount of money which it would have to invest in the four new.wells; and that he.could not recall any dry holes having been drilled in the Pine Island chalk rock formation. Upon being cross-examined with reference to the just demand of the lessors that the lessee drill additional wells on . the leased premises, the witness answered “I would
 
 *334
 
 like to drill a well”; and upon being asked the question if he thought it would be profitable to his company to do so, he stated: “I thought if our cash was available, and they thought they wanted to take their chances, then I was ready to take my part of it.”
 

 In the case of Logan v. Tholl Oil Co., Inc., et al., 189 La. 645, 649, 180 So. 473, 475, this Court said.:
 

 “ ‘This court has repeatedly held that the main consideration of such a lease is the development of the land for oil and gas and that the lessee must either develop with reasonable diligence, or give up the lease.
 

 “
 
 ‘A development that falls short of a reasonable production which would bring a net profit to the lessee and furnish an adequate consideration to the lessor for the continuance of the lease might well be said to be no development at all within the contemplation of the parties.’
 
 Caldwell v. Alton Oil Co., 161 La. 139, 108 So. 314, 315. (Italics ours.) See, also, Green v. Standard Oil Co., 146 La. 935, 84 So. 211; Hunter v. Booker, 158 La. 690, 104 So. 618; Smith v. Sun Oil Company, Inc., 165 La. 907, 116 So. 379.” See, also, Brown et al. v. Sugar Creek Syndicate et al., 195 La. 865, 197 So. 583.
 

 In the case of Brewster v. Lanyon Zinc Company, 8 Cir., 140 F. 801, at page 810, the Court stated: “* * * There could not well have been an express stipulation as to the number of wells to be drilled, as to when the wells, other than the first, should be drilled, or as to the rate at which the production therefrom should proceed, because these matters would depend in large measure upon future conditions, which could not be anticipated with certainty, such as the extent to which oil and gas, one or both, could be produced from the premises, as indicated by the first well and any others in the vicinity, the existence of a local market or demand therefor or the means of transporting them to a market, and the presence of wells on adjacent .lands capable of diminishing or exhausting fhe supply in the natural reservoir. * * *”
 

 Wilson was compelled to admit that the company which he represents and owns an interest in, after a period of eighteen years of operation, had just about gotten its money back from the drilling and operating investment in this lease; that the company had previously given up a large part of the Goodwin lease because it failed to develop the property; that while he considered the land covered by the present lease sufficiently developed to comply with the obligations of the lease, he inconsistently says that he was willing to drill hew wells on the land and would not deny that it would be a profitable investment if drilling operations had been in the modern way in which the other major companies had performed theirs.
 

 It is our opinion that the trial judge, under the evidence, correctly held that the defendant had failed to fulfill its implied obligation and covenant to further develop the property by drilling new wells with the modern process which had proved so successful on other leased properties adjoining and in the vicinity of the
 
 *335
 
 property in question in the Pine Island Field.
 

 As to the second issue of whether or not the plaintiff placed the defendant in default and afforded it a reasonable opportunity to drill new wells on the property, the record shows that W. P. Wilson, manager and agent of the defendant corporation, and a stockholder therein, admitted that William H. Wadkins, one of the lessors, on three different occasions over a considerable period of time had talked with him as to the advisability of drilling new wells ■on the leased premises, in order to increase ■production; that Wadkins threatened the last time he spoke to him, in December 1940, to institute suit to have the lease forfeited and cancelled if the new wells were not drilled; that he promised to take the matter up with his Board of Directors within ninety days; that he never wrote the members of the Board of Directors in Indiana as he intended to go up there and discuss the matter with them personally; that the first suit was erroneously filed by the plaintiffs against one of the companies lie represented, i. e., The Double “II” Oil Company, on March 10, 1941, but this was mot the operating company under the lease; that the second suit or the present one was filed on March 17, 1941 against the Wilson Oil Corporation, the proper defendant; .and that nothing had been done ■ about ■drilling new wells up until the date of the trial on April 29, 1941. Apparently no effort has been made by the defendant to "have the wells drilled even up to the present time, because it is asking this Court to sustain its defense that it has not failed to develop the leased premises properly but has complied with its obligations fully in that respect.
 

 In the case of Louisiana Farms Co. v. Yazoo & M. V. R. Co., 179 La. 539, 154 So. 445, 446, the plaintiff instituted a suit for damages for the alleged violation of a verbal contract. The defendant filed an exception of no right and no cause of action on the ground that the plaintiff did not allege or prove that a demand for performance of the contract was made in one of the ways prescribed by Article 1911 of the" Civil Code, by putting a party in default in the case of a passive violation of a contract. The Court said: “ * * * Article 1933 of the Code provides that, when there is only a passive breach, and not an active breach, of a contract, damages are due only from the time the obligor is put in default; and article 1911 provides that a demand, in order to have the effect of putting the obligor in default, 'may be made, either by the commencement of a suit, by a demand in writing, by a protest made by a notary public, or by a verbal requisition made in the presence of two witnesses.’ But it is well settled that,
 
 if the defendant in a suit for damages for an alleged passive violation of a contract denies the alleged obligation, or denies that it was violated, it is not necessary for the plaintiff to allege or to prove that a demand for performance of the alleged obligation was made in one of the forms prescribed by article 1911 of the Civil Code. The reason for that is that it would be
 
 
 *336
 

 inconsistent for one to deny the obligation of a contract, or to deny that he had violated the obligation, and at the same time wrge that a proper demand might have brought forth a performance of the obligation on his part.
 
 Beck v. Fleitas, 37 La. Arm. 492; Southern Sawmill Co. v. Ducote, 120 La. 1052, 46 So. 20; Johnson v. Levy, 122 La. 118, 47 So. 422, 16 Ann.Cas. 978; Reinach v. Jung, 122 La. 610, 48 So. 124.” (Italics ours.) See, also, Brown et al. v. Sugar Creek Syndicate et al., supra.
 

 In the instant case, the evidence shows that the defendant’s agent, although repeatedly requested by the plaintiffs to drill additional new wells on the premises, peremptorily refused to do so, because he did not even take the matter up with his home office. Furthermore, the defendant, in pleading that it had fulfilled its obligations and in denying that it was under any obligation to drill new wells, has placed itself squarely within the holding of the above authority and, therefore, it was unnecessary for the plaintiff either to allege or prove that the defendant had been placed in default. The defendant certainly has had ample time to perform its obligations and has failed to do so. It is not entitled to additional time.
 

 •The' plaintiffs also sought damages against the defendant for permitting drainage of the oil from the leased property by failing and refusing to drill offset wells thereon. They concede that the proof is insufficient to -establish the claim .and have abandoned it.
 

 For the reasons-assigned, .the judgment appealed from is affirmed.