371 So.2d 305 (1979)
WASECO CHEMICAL & SUPPLY CO., Plaintiff-Appellee,
v.
BAYOU STATE OIL CORPORATION, Defendant-Appellant.
No. 13849.
Court of Appeal of Louisiana, Second Circuit.
May 1, 1979.
Rehearing Denied June 8, 1979.
*306 Blanchard, Walker, O'Quin & Roberts by Marlin Risinger, Jr., Shreveport, for defendant-appellant.
Egan & Cook by Reuben W. Egan, Shreveport, Milling, Benson, Woodard, Hillyer, Pierson & Miller by C. E. Hall, New Orleans, for plaintiff-appellee.
Before BOLIN, PRICE and MARVIN, JJ.
En Banc. Rehearing Denied June 8, 1979.
MARVIN, Judge.
Bayou State, as defendant-lessee of an oil and gas lease, appeals from a judgment cancelling the lease for its failure to diligently develop the leased premises as a reasonably prudent operator. R.S. 31:122.[1] Plaintiff answers the appeal, seeking to increase the awards made below for the fees of its experts and attorneys.
In excellently detailed written reasons for judgment, the trial court concluded that Bayou State had not diligently operated or developed the lease as a reasonably prudent operator for the mutual benefit of itself and its lessors and had not exhibited the type of "fairness" required by law in the lessor-lessee relationship.
In addition to the obvious issue as to the obligations of a reasonably prudent operator under the particular circumstances of this case, the issues include the problem of dissolution of the lease vs. allowing a time for performance by the lessee in default. Defendant contends that its lease should not be cancelled without allowing defendant an opportunity to perform the obligations which the lower court found were imposed on it as lessee. C.C. Arts. 2046, 2047.

THE LAW
In Vetter v. Morrow, 361 So.2d 898 (La.App. 2d Cir. 1978), we had occasion to state the primary consideration or cause of an oil and gas lease and the obligations *307 imposed on the lessee as derived from R.S. 31:122 and from Carter v. Arkansas Louisiana Gas Co., 213 La. 1028, 36 So.2d 26 (1948). We said the primary cause or consideration of an oil and gas lease is the development of the minerals. Development in this sense is not only the exploration for, but the exploitation of, or the capture and marketing of, the minerals which may have been discovered by the fulfillment of the lessee's obligation to explore. In Vetter, we said:
"A mineral lessee is under a duty to develop and operate the property leased as a reasonably prudent operator for the benefit of himself and his lessor. La.R.S. 31:122 . . .
"To fulfill his duty . . . a lessee has the obligation to develop [explore, exploit, capture and market] known mineral producing formations in the manner of a reasonable, prudent operator . . .
"In deciding whether development [exploration, exploitation, capturing and marketing] has been reasonable for the benefit of both the lessor and lessee, the jurisprudence has usually considered the following factors: (1) geological data; (2) number and location of the wells drilled both on leased lands and adjoining property; (3) productive capacity of producing wells; (4) costs of drilling operations as compared with profits; (5) time interval between completion of the last well and the demand for additional operations; and (6) acreage involved in the disputed lease." 361 So.2d at pp. 899-900
Applying these factors to the circumstances of this case as found by the lower court, which, we add, are fully supported by the record, compels our concluding, as did the lower court, that Bayou State failed in its obligation of diligent development of the Scanland lease for the benefit of itself and the lessors. We shall discuss some of these circumstances in the section of this opinion entitled Facts.
After judgment was signed below, Bayou State sought to present a timetable and fireflood development it proposed to perform on the Scanland lease. The proposal generally provided that Bayou State, in four consecutive six month periods of time would drill and ignite a total of 12 fireflood patterns containing not less than 38 producing wells after Bayou State had gained the approval from the State Department of Conservation for the project. Bayou State's motion to reopen and motion for a new trial were denied by the lower court with these comments:
"Of course, I have had [Bayou State's] motion before me and have gone over the plan that was submitted there. I feel like that a statement of mine in the opinion might have brought this question on. I think that statement was, this declaration by counsel does not provide a timetable, nor set forth what its operation would entail. But, before that in the opinion I commented upon the fact that the defendant's position had vacillated between an exotic and an experiment to something they were ready to do. Frankly, gentlemen, I toned down my decision in this case concerning this. I put in this one sentence concerning the timetable, but frankly it appeared to the Court that Bayou State learned as much about fireflooding in the two weeks of our trial as it had in its twenty years of operation. As I said, that was my feelings, that was my first draft and I elaborated on this proposition. I eliminated it. I don't think that this was just another statement in the Court's opinion as to the position that Bayou State had taken from the beginning of this trial to the end. The Motion for a New Trial is denied." (Emphasis supplied.)
Among the pertinent Civil Code articles on the question of dissolution are Arts. 2046 and 2047, which read:

Art. 2046 A resolutory condition is implied in all commutative contracts, to take effect, in case either of the parties do not comply with his engagements; in this case the contract is not dissolved of right; the party complaining of a breach of the contract may either sue for its dissolution with damages, or, if the circumstances of the case permit, demand a specific performance.

*308 Art. 2047 In all cases the dissolution of a contract may be demanded by suit or by exception; and when the resolutory condition is an event, not depending on the will of either party, the contract is dissolved of right; but, in other cases, it must be sued for, and the party in default may, according to circumstances, have a further time allowed for the performance of the condition.
The authorities concerning, and the basis for, dissolution are excellently and concisely explained in 7 Litvinoff, La.Civil Law Treatise, Book 2, in sections and pages hereafter cited, with footnotes omitted and emphasis supplied:
"The requirements to obtain dissolution of the contract are two: first, the other party's failure to perform; second, that the dissolution be judicially pronounced.
"The failure to perform must be sufficiently serious to justify the dissolution of the contract; it must also be imputable to the party who does not perform. The motion of a party not complying with his engagement, as expressed in article 2046 of the Louisiana Civil Code, is broad enough to cover not only a total but also a partial failure to perform, as would occur, for example, when the obligor has paid only a part of the price, or has performed the contract only for a part of its intended duration. It also covers the nonperformance of an accessory obligation, and the rendering of a defective performance. In sum, the different ways of violating an obligation, accounted for in article 1931, may also be read into article 2046 of the Louisiana Civil Code.
"In situations other than total or absolute nonperformance, the obligee's right to demand that the partial or defective performance be completed or perfected, with damages, is unquestionable. Under articles 2046 and 2047 he has the choice to demand dissolution instead. If he does so, it is not unquestionable that he will obtain it, as the court, in its discretion, may find that the partial or relative failure to perform of which plaintiff complains is not a sufficient reason to grant dissolution.
"The action of dissolution belongs only to the party who, having performed his obligation, or being ready to perform it, cannot amicably obtain the performance he expected from the other party. It is clear that the latter cannot be allowed to bring such an action.
"For dissolution to be obtained, the fact of nonperformance must have occurred by the other party's fault. Neither article 2047 of the Louisiana Civil Code nor article 1184 of the French seems to be applicable to situations where the failure to perform has been caused by a fortuitous event or irresistible force. * * *". § 269, pp. 506-508.
"The dissolution of a contract must be pronounced by the court. The remedy of contract dissolution is not to be regarded as a convenient way for a party to unburden himself of the contract. For this reason, it cannot depend solely on the will of the party complaining of nonperformance by the other. If such were the case, a party might abuse the right in a situation where there was mere delay or only partial nonperformance, and utilize such a relative failure of the other party to perform as a tool to obtain dissolution to the plaintiff's advantage. The intervention of the court is the best possible means of establishing, with certainty, that the complaining party has good reasons to demand dissolution. The principle of judicial dissolution appears, thus, as a necessary consequence of the overriding principle of good faith which subjects the parties to the duty of observing a degree of tolerance in the matter of contract performance. * * *
"The necessity of a judicial demand affords an opportunity for the exercise of the court's sovereign prerogative of weighing all these circumstances with large discretion. It is for the court to determine whether the rendering of only partial performance by the obligor, plus the delay attending a possible completion, or the failure in performing an accessory obligation, warrants dissolution. For this purpose the court takes into consideration the extent and gravity of the failure to perform alleged *309 by the complaining party, the nature of the obligor's fault, the good or bad faith of the parties involved, and also the surrounding economic circumstances that may make the dissolution opportune or not. Upon consideration of all such factors, a choice must be made among several courses of action.
"The court may pronounce the dissolution of the contract. This is, of course, the appropriate choice when the obligor has failed to perform out of a fraudulent design: in such a situation the dissolution operates as a sanction for bad faith. A fraudulent intent on the part of the obligor, however, is not necessary to produce dissolution. Any failure to perform involving some fault on his part suffices for this purpose, although a defaulting obligor in good faith will always enjoy the sympathy of the court. The obligor in default may usually prevent dissolution by tendering performance. In its discretion, however, the court may find such a tender or offer to perform untimely and pronounce the contract dissolved because of the obligor's unjustified delay. Together with dissolution, the obligee may recover damages for nonperformance. The court, however, may pronounce dissolution without damages when both parties are at fault, or when no fault can be found in either party." § 270, pp. 508-510.
"If taken to the letter, articles 2047 of the Louisiana Civil Code and 1184 of the French would seem to indicate that all a court can do in its discretion is grant a further delay for performance. That is not so, however, not only in the light of the doctrine of partial dissolution discussed above, but also in light of positive rules governing special contracts. Thus, in the matter of sales, article 2511 of the Louisiana Civil Code states: `If the buyer be evicted from a part only of the thing sold, and it be of such consequence relatively to the whole, that buyer would not have purchased it without the part from which he is evicted, he may have the sale canceled.' Article 2515 further provides: `If the inheritance sold be incumbered with non-apparent servitudes, without any declaration having been made thereof, if the servitudes be of such importance that there is cause to presume that the buyer would not have contracted, if he had been aware of the incumbrance, he may claim the canceling of the contract, should he not prefer to have an indemnification.'
"It is clear that, under these articles, the discretion of the court does not stop at the mere granting of a further time to perform, but extends to determining whether the performance not rendered by defendant was the cause of plaintiff's obligation, in which case dissolution must be granted, or whether the failure in defendant's performance is not so grave as to have deterred plaintiff from entering the contract, had he foreseen it, in which case he will be granted damages or a proportional reduction of his own performance.
"In this context a Louisiana court once said: `Nothing can bring into a stronger light the true spirit and intent of our law in allowing at all the dissolution . . . than that provision of Article 2047 by which the whole matter of allowing dissolution or not, or of granting further time or not, is left to the judge, so that the dissolution of the contract never does become a matter of absolute right on the part of the creditor.'
"The need for judicial discretion in the matter of contract dissolution is firmly established in the Louisiana jurisprudence. * * *". § 272, pp. 513, 514.
"Whether an obligor has a right to perform after he has been placed in default is a question that merits some consideration.
"If the obligee has placed him in default by any of the methods specifically provided in article 1911(2) of the Louisiana Civil Code, that is by addressing to him a request for performance, it seems clear that the obligor may then perform provided, of course, that his failure to perform has been only relative so far and therefore that performance is still possible. In the first place, an obligee who chooses such a course of action is no doubt willing to receive the performance he requests. In the second place, it would make no sense to prescribe *310 as a requirement that the obligor must be entreated to perform, on the one hand, and on the other to conclude that he can no longer perform once he has been so entreated. Performance thereafter default, in such a case, must be accompanied by fulfillment of the accessory obligations arising from the obligor's failure, such as damages for delay or for defects in a performance already rendered.
"It is different when the obligor is placed in default by means of a suit for dissolution brought by the creditor. Plaintiff contends, in that case, that the extent of defendant's nonperformance is such as to give rise to a right in the obligee to obtain the dissolution of the contract. He contends, in other words, that the obligor's failure to perform is absolute, either because performance is now impossible through his fault, or because, though possible in fact, the obligor's fault has made such performance of no value for the obligee.
"Though such a demand amounts to a putting of the defendant in default, as shown above, it is not exactly a demand for performance. Defendant may controvert plaintiff's petition and deny that he has failed to perform, or he may aver that his failure has been only relative. In either case, as a means of showing an alleged fallacy in plaintiff's position, the defendant may offer to perform.
"Under articles 1184 of the French and 2047 of the Louisiana Civil Code, the fate of the contractual relation between the parties, in such a situation, is placed in the hands of the court, by virtue of the principle of judicial dissolution. The court must then take into account the extent of the obligor's failure to perform, his good or bad faithand the creditor's as welland also the economic circumstances that may render the requested dissolution opportune or not. In the exercise of its sovereign discretion the court may refuse dissolution and allow defendant to perform as offered, with damages for delay if such is the case, or even grant him additional time to perform, or pronounce the mere dissolution of the contract, or grant dissolution with damages.
"It follows that, when confronted with a suit for dissolution that placed him in default for his failure to perform, the obligor has a right to offer performance, but there should be no doubt that he has no `right to perform'.
"At times, the Louisiana jurisprudence has failed to distinguish the position of an obligor placed in default according to article 1911(2) of the Louisiana Civil Code from that of an obligor placed in default according to article 2047. As [a] result, the right to perform of an obligor in default was overstated in absolute terms. This approach was later changed, however, so as to conclude that an obligor placed in default under article 2047 of the Louisiana Civil Code has no right to `tender' performance, though, in the discretion of the court, he may nevertheless be granted an additional time to perform." § 278, pp. 524-526.

THE FACTS
The lease in question, known as the Scanland lease, was executed in 1934 by predecessors in title of the litigants on 80 acres in the Bellevue field in east central Bossier Parish. The Scanland lease and adjoining leases in the Bellevue field are depicted on this plat:
 The Bellevue field consists of approximately 900 surface acres and produces oil from the Nacatoch sand between 350-500 feet below the surface. The field was discovered *311 in 1921. After initial production and pressure subsided, the field did not produce any great quantity of oil until about 1963, because of the nature of the oil remaining in place. Bellevue residuary oil is a heavy, asphaltic, high viscosity oil (19° API crude) in a sand with very low gas saturation, and with essentially no reservoir pressure or susceptibility to water drive. Great quantities of water are produced with the oil by the stripper method of production common in the field before 1963. Bellevue wells are shallow, closely spaced (one or more wells per acre), and are capable of being drilled with little risk, inexpensively, in about 12 hours.
In 1952 and 1953 Bayou State acquired the Scanland lease. Bayou State operated this lease and other properties in the Bellevue field, selling all of its production from the Scanland lease to itself for use in its refinery located at Hosston, north of Shreveport, some 50 miles from Bellevue. When judged even by 1950 standards, Bayou State's production operations on the Scanland lease were found to be derelict, antiquated, cheap and inefficient.
When Bayou State acquired the Scanland lease about 50 wells had been drilled on the 80 acres, most of which were producing. Average production in 1955 was shown to have been 46 barrels per day. Bayou State made no capital expenditure on the lease and drilled no wells during its 24 years as lessee-operator. In recent years production was reported to State authorities from 10 wells on the lease, but it was shown and admitted that production, which had declined by 1976 to about six barrels a day, was obtained from only nine wells.
It was also shown that Bayou State's methods of gauging or measuring and securing the oil sold, and of avoiding the comingling of this oil with production from other leases were haphazard and left much to be desired. The lower court expressed doubt as to whether or not Bayou State had been producing oil from the lease by its methods in paying quantities.
Because of the age of the field and extensive drilling and testing, the subsurface of the Bellevue field is generally known. The quality and thickness of the Nacatoch sand from which production is obtained has been graphically depicted. In some areas of the field the sand is more productive than other areas. There are minor faults and divisions of the sand. The 80 acre Scanland property, however, in the broad sense, is no better or worse than adjoining properties from which increased production has been obtained for more than a decade. There is approximately 50 feet of Nacatoch sand under the Scanland lease with estimated recoverable reserves in excess of 3,000,000 barrels of oil. The 40 acre Getty-Elston lease, on which Getty began its fireflood project in 1963, has already produced more than 2,000,000 barrels of oil and is yet producing. About 80-90 acres of the larger Getty-Lodwick Lumber Company lease has been fireflooded by Getty during the 10 years before this suit was filed and it has already produced more than 2,500,000 barrels of oil.
Getty has drilled almost 500 wells on its leases since 1963 and plans to drill 200 more wells in its fireflood program. Bayou State drilled several wells on its Wyche lease in its fireflood operation, but has drilled no wells on Wyche since 1975. Bayou State admits that its production from the Wyche lease is geared to its refinery's capacity. Cities Service has drilled hundreds of wells in its fireflood operations since 1971.
Bayou State operated for Getty Oil Co. in the Bellevue field for several years. In 1963 Getty took over a portion of its Elston lease from Bayou State and began a fireflooding project (in situ combustion) to stimulate production. The fireflood method was expanded rather rapidly to other leases and proved successful by 1967. Knowledge of Getty's increased production was available to Bayou State. Bayou State sometimes did contract work for Getty on Getty's wells during Getty's first fireflood operations. Bellevue fireflood projects have been well publicized.
Getty's pilot fireflood program on 2.8 acres increased production from about 4 barrels a day to about 100 barrels a day in approximately 18 months. Getty took over *312 from Bayou State the operation of the rest of its Elston lease and its Lodwick Lumber Co. leases and began to acquire other leases in the area, some of which had once belonged to and had been abandoned by Bayou State (Buckelew, for instance). Getty proposed to Bayou State a fireflood program for Bayou State's operations in 1967. Bayou State proposed to Cities Service a fireflood program for Cities Service properties in 1969 and started a fireflood of its own on the Bayou State-Wyche lease in 1970. Cities Service began a fireflood operation on its Bodcau lease in 1971.
Fireflooding successfully produces about 60 percent of the oil in place while the stripper method of production produces five percent. The sand thickness underlying the Scanland lease is conducive to fireflood operations. It was shown that royalty owners under fireflood recovery receive more than $1200 per acre per month while those under a stripper recovery receive less than $3 per month. Bayou State's own fireflood on the Wyche lease recouped capital expenditures and operating expenses by 1975 and the Wyche lease has since maintained its profitability. Bayou State, however, has not drilled any wells on Wyche since 1975. In planned programs of expanding production, Cities Service and Getty have drilled and reworked hundreds of wells since their respective fireflood operations began. As of March 1977, Getty was fireflooding its 40 acre Elston lease, about 80-90 acres of its Lodwick lease, its 80 acre Buckelew lease and its 40 acre Buckelew lease. Cities Service firefloods its 40 acre Bodcau Bayou lease north of Scanland in Section 15 and its 80 acre Bodcau Bayou lease in Section 11. These leases and the Bayou State-Wyche lease, which is also fireflooded, are shown on the plat, supra.
Bayou State contracted with Kadane Corporation for a plan for extensive fireflood operations in 1972 on its Wyche lease, but revealed no plans until after trial for fireflooding the Scanland lease. Bayou State's Kadane fireflood expert was of the opinion as early as 1969 that a fireflood project should be attempted on the Scanland lease but neither he nor Bayou State made a feasibility study for a fireflood for Scanland. This expert stated that on all Bayou State Bellevue properties a fireflood would be tried "at some time or another". The Bayou State-Wyche lease has not been made as productive as the other firefloods of Getty or Cities Service. The Bayou State-Wyche fireflood has not been more widely expanded, according to this expert, because of "money limitations".
The Bayou State-Scanland lease of 80 surface acres comprises about 10 percent of the Bellevue field. Its Nacatoch sand thickness and comparative productive potential comprises at least that percentage of the total field.
While technically called a technique of secondary recovery, fireflooding is, as to the type of the Bellevue residuary oil, as the trial court emphasized, the "only method of producing the Bellevue field and has been for a number of years . . . the normal [and] efficient method . . ."
Considering then the factors mentioned in Vetter, supra,
(1) geological data;
(2) number and location of the wells drilled both on leased lands and adjoining property;
(3) productive capacity of producing wells;
(4) costs of drilling operations as compared with profits;
(5) time interval between completion of the last well and the demand for additional operations; and
(6) acreage involved in the disputed lease;
the lower court was correct in cancelling the lease.
Considering C.C. Arts. 2046 and 2047, the trial court was also correct in cancelling the lease. Demands and inquiries were made on Bayou State by the Scanland lessors for several years before suit was filed in 1977. Bayou State proposed to Cities Service sometime before 1970 to fireflood Cities Service property, including the 40 acres immediately south of Scanland. Bayou State *313 said this was done because it was looking for more acreage to develop. The absence of technical studies as to Scanland and the absence of an intent to develop Scanland is well shown by circumstances detailed in the lower court's reasons for judgment. These circumstances include the haphazard and lax methods of measuring and securing the oil produced and the inaccuracy of reports to the state authority of what oil was produced from Scanland. These circumstances also include Bayou State's responses to its Scanland lessors' demands for development and its failure to specifically plan for the proven method of development which Bayou State itself and others have successfully employed on other adjoining properties. See Wadkins v. Wilson Oil Corporation, 199 La. 656, 6 So.2d 720 (1942).
The lower court summarized its conclusions by stating that Bayou State's failure to fireflood has been of longer duration and is more evident than the lessee's failure to employ modern and proved methods of recovery in Wadkins, supra, where the lease was dissolved and the lessee was not allowed additional time to perform.
The lower court's comment about fairness in the contractual relationship is a parallel of the inquiry into the question of Good faith between the parties in an action to dissolve a contract without additional delay. See Litvinoff, § 270, supra:
"For this purpose the court takes into consideration the extent and gravity of the failure to perform alleged by the complaining party, the nature of the obligor's fault, the good or bad faith of the parties involved, and also the surrounding economic circumstances that may make the dissolution opportune or not. Upon consideration of all such factors, a choice must be made among several courses of action."
We agree that the lease should have been cancelled without additional delay.

THE FEES AWARDED BELOW
While the awards appear somewhat low, they are not so low as to constitute an abuse of the discretion afforded trial courts in the fixing of fees. The amount awarded below for attorney fees shall be increased by $1,000 to compensate for the time involved in briefing and arguing here.
For reasons detailed below and summarized here, at appellant's cost, judgment below, as amended, is
AFFIRMED.
NOTES
[1] This case concerns the fireflood method of recovering oil in place, successfully employed in the Bellevue Oil Field since 1963. As will be shown, the fireflood method of producing the Bellevue type oil results in recovery of about 60 percent of the oil in place. An injector well is drilled and ignited and air compressors keep the fireflood burning. The burning oil sand produces several hundred degrees of heat which vaporizes the oil and water. About five percent of the heaviest part of the oil is not vaporized. This residue supplies fuel through which the fire will continue burning. Recovery wells then pump from their well bores the oil ahead of the fireflood which either is liquefied by or which condenses from the heated vapor. This method increases approximately 30 times the production obtained by the older stripper method which allows slow recovery of about five percent of the oil in place. The rate of recovery is also greatly increased by the fireflood method. The crux of this case is defendant's failure and refusal to employ the fireflood method to the property.