LAND, J.
This is a suit to recover $20,-000 damages for the breach of an alleged promise of marriage made by Lazare Levy, deceased, who was killed on June 29, 1903, by the father of the plaintiff. The suit was instituted against three of the nine heirs at law of the said Lazare Levy. It was dismissed on an exception of no cause of action; but on appeal the judgment was reversed, and the case was remanded, gee 118 La. 447, 43 South. 46. The cause was tried before a jury, which found a verdict in favor of the plaintiff for the sum of $6,660.66%, .being the full prof>ortionate shares of the three .defendants in the amount claimed. From a judgment pursuant to the verdict, the defendants have appealed.
According to the allegations of the petition, the plaintiff became acquainted with Lazare Levy in August, 1901, and the proposal of marriage was made and accepted during the latter part of November, 1901. It is further alleged that the plaintiff, who was then about 22 years of age, was seduced by the said Levy in or about November, 1902, and that she yielded under his assurances that he would promptly fulfill his repeated promises of marriage; that she became pregnant in consequence of said seduction, and when she became aware of her condition appealed to Levy to fulfill his promise of marriage; that Levy put her off from time to time by reassurances and repetitions of his promise of marriage, until the petitioner finally became disheartened and confessed her condition to her mother; that her father, in her behalf, in the presence of her brother, Clarence Johnson, and one William Gilmore, made a demand upon said Levy on June 29, 1903, to fulfill his promise and perform his obligation to marry petitioner, but that said Levy refused to do so; that on August 22, 1903, she gave birth to a boy, the fruits of said seduction, etc.
For answer, the defendants specifically denied the alleged promises of marriage and the alleged seduction, under promise of marriage or otherwise, and charge that the plaintiff was unchaste and had • given birth to a child before her connection with Lazare Levy.
At the date of the alleged promise of marriage, in November, 1901, the plaintiff was residing with her father and mother on Cote Blanche Island, a sugar plantation belonging to Lazare Levy, and on which he resided. B. R. Johnson, the father of the plaintiff, was employed by Levy as a carpenter and wheelwright, and also rendered services as a veterinary surgeon. Levy was a bachelor, and visited the plaintiff frequently at her father’s house. Johnson in his testimony states that he objected to these visits on account of the *121 reputation oí Levy, and left the island in February, 1902, on account of them. After Johnson moved to Franklin, Levy continued his visits. When aslred as to the relations which existed between his daughter and Levy, Johnson said:
“Well, X think that they were engaged; at least, we thought they were. He made his regular visits, and, of course, we did not think that he came there for anything else. He always claimed he would take as good care of our daughter as we would ourselves. He told my wife before me that he would take as good care of my daughter as we would ourselves.’
This is the sum of Johnson’s knowledge as to the relations which existed between his daughter and Levy between the fall of 1901 and May, 1903, when her pregnancy was revealed.
Mrs. Johnson, the mother, testified that Levy visited her daughter two or three times a week between the fall of 1901 and the latter part of May, 1903; that Levy seemed to be infatuated with her daughter, was very attentive and fond, and would write to her almost daily; that her daughter informed her of their engagement, and had all of her trousseau made,' with the exception of the wedding dress; that they were to be married in the fall of 1902, but the wedding was postponed at the instance of Levy until after the grinding season. Mrs. Johnson’s information was derived from her daughter, and she admits that Levy did not ask her “in plain words” for her daughter, but says that the inference was conclusive from his frequent visits and conduct; that Levy asked her younger daughter to call him brother, and displayed solicitude about the health of the plaintiff, and implored her not to make much of a trousseau, as he could get her all she would want after they were married.
The plaintiff herself testified that Levy made her a proposal of marriage in October or November, 1901, and other promises of marriage before he seduced her in November, 1902.
Commencing in August, 1901, the two parties kept up a correspondence in cipher, the key to which was furnished by Levy in his own handwriting. The system consisted of a transposition of letters. A letter of October 27, 1901, is signed, “Your own Lazare,” contains words of endearment, such as “dearest” and “darling,” and exhibits symptoms of jealousy. Similar letters followed, but there is in none of them any express reference to marriage. We, however, find in these letters expressions indicating that plaintiff was in a short time to become Levy’s “own property”; that Levy was to possess her “body and soul,” and to do with her what he pleased; that they were “to be together, no more to leave one another,” and others, tending to show that the parties expected to live together for an indefinite time. Plaintiff produced, identified, and filed in evidence the following note:
“Darling, have patience, dear. In a few months I will be your own. Then you can speak to me all day, sweetheart. No doubt it is just as easy for you to wait as it is for me. Your own Lazare.”
This note was presumably written in response to a letter from the plaintiff, which the defendants produced and filed in evidence. This letter is not dated, but was evidently written after the pregnancy of the plaintiff became known to her family. It shows that the plaintiff was forbidden to communicate with Levy, and that she was told that Levy cared nothing for her, and as soon as he could settle his business would go away, and leave her and her baby to their fate. This letter shows that the plaintiff seems to have accepted the situation, and suggests no engagement or promise of marriage. The closing part of the letter reads as follows:
“I cannot see you anywhere else, and as it would be very unpleasant for you to come here, therefore you will soon be going away on your trip, and I will not see you any more; but, darling, there is one thing I must ask of you, and that is, remember that I shall not be able *123 to make my own living for several months. Eor myself I can get along, all right; bnt, love, the little one that’s coming will be your own 'little child as well as mine, and you must help •me to take care of it, and not let it starve until I am able to support it myself. After that we shall not be a burden to you, darling. Tour ,own devoted.”
This cry from a woman he had loved, and who was about to become the mother of his child, seems to have evoked from Levy the response already quoted, which was in effect •a promise to repair the wrong by marriage. Subsequently Levy took a second thought and wrote evasive letters, and finally denied any promise or obligation on his part to marry the plaintiff, when interviewed by Dr. Smith at the instance of plaintiff’s father.
The defense is that Miss Johnson was Levy’s mistress or concubine, and that he never promised or had any idea of marrying her, because in the very beginning he was fold that she was a fast woman, of unchaste character. As to Miss Johnson’s previous character, there is a conflict of evidence, and even the two doctors disagreed in opinion as to whether she had previously given birth to a child. Levy visited and addressed the plaintiff as a lady, and there is nothing in his letters to suggest that he considered her a loose woman on the market. His gifts to her were too trivial to constitute a lure or a bribe. He pursued her with his respectful attentions for more than 12 months, before «he could be induced to visit his plantation on the strength of an apparent invitation from a married woman residing thereon. Levy’s correspondence shows that Miss Johnson in her own house was under the watchful eye of her mother, and that he importuned her to visit his plantation, and suggested that Mr. and Mrs. M. would be glad to entertain her. Plaintiff’s story is that the invitation was written by Levy in the name of Mrs. M.; that on her arrival Mrs. M. had no room for her, and she was compelled to sleep in Levy’s house. Her seduction followed, and she visited Levy’s home once or twice after-wards. This conduct of plaintiff undoubtedly weakens her ease, but does not prove • that she did not yield under a promise of marriage.
Plaintiff’s testimony as to the promise of marriage is corroborated to some extent by that of her father and mother, the letters of Levy, and the conduct of the parties. A promise of marriage may be inferred from such conduct and behavior as are customary between persons under contract of marriage. Am. & Eng. Ency. Law (2d Ed.) vol. 4, pp. 886, 887; Cent. Dig. vol. 8, p. 935, § 31. The jury evidently believed the testimony of the plaintiff, and on the evidence we are not prepared to say that their finding on this point is erroneous.
We agree with counsel for defendants that the testimony of Dr. A. J. Smith as to his interview with Levy should have been admitted, as Dr. Smith was requested by plaintiff’s father to interview Levy and to ascertain whether he would marry the daughter. Dr. Smith testified that Levy admitted the illicit relations, but denied absolutely that he had ever made any proposal of marriage to Miss Johnson or had engaged to marry her. The defendants absolutely deny in their answer the promises of marriage alleged in the petition, and do not plead, even in the alternative, that Lazare Levy was never put in mora. The want of default cannot avail a defendant who has absolutely denied the existence of the contract, for the breach of which damages are claimed. See Beck v. Fleitas, 37 La. Ann. 495; Southern Sawmill Co. v. Ducote, 120 La. 1052, 46 South. 20.
On the day he was killed, Levy declared that he would not marry the plaintiff, although the demand was made by her father with a Winchester rifle in his hand. Hence we do not consider that a technical default was necessary, as it would have been a vain and useless ceremony.
*125 We consider the award of damages as manifestly excessive. Alimony for the support of the child cannot he considered in a suit of this kind. Smith v. Braun, 37 La. Ann. 225. In that case, the woman was also seduced and had a child, and the award of the jury was $1,500 damages, the highest amount allowed in our reported cases.
In Kuck v. Johnson, 114 La. 781, 38 South. 559, where there was no seduction, the plaintiff sued for $20,000 damages and was awarded $1,000. In other jurisdictions awards of from $5,000 to $10,000 have not been deemed excessive. Century Digest, vol. 8, pp. 957-959.
In the case at bar the estate of the deceased is valued at $45,000. The award below was on the basis of $20,000 against the estate. If the marriage had been consummated and the husband had then died, the plaintiff could have recovered one-fourth of his estate. The law considers her seduction and pregnancy as an aggravation of damages. 5 Cyc. 1014.
The other party has paid for his transgression with his life, and the question is now between the plaintiff and his heirs as to what is a just compensation for the injury which she has sustained. Exemplary damages cannot be allowed against the defendants. Edwards v. Ricks, 30 La. Ann. 926.
In the absence of any standard by which the injury may be measured in dollars and cents, the question is left to the sound discretion of the jury, or the court, as the case may be. Our appellate jurisdiction over the facts compels us to exercise that discretion, rather than remand the case for trial before another jury. Considering all the facts and circumstances, we deem a total award of $10,000 damages sufficient for the purposes of justice in this particular case; the three defendants to be charged with their virile -■shares, or one-ninth each.
It is therefore ordered that the verdict and judgment appealed from be amended by reducing the amount from $6,666 6«/i00 to $3,333 ss/100, and as thus amended, be affirmed; costs of appeal to be paid by plaintiff, reserving her rights against the other heirs of Lazare Levy.