Floyd **WILLIAMS**, Frederick C. Williams, Barton W. Freeland, C. J. Freeland, Jr., John Ed Freeland, I. R. Price, Edward H. Taussig and Edwin F. Gayle, Plaintiffs,

v.

**HUMBLE OIL & REFINING COMPANY, Defendant.**

Civ. A. No. 14312.

United States District Court
E. D. Louisiana,
New Orleans Division.

Aug. 28, 1968.

See also, D.C., 234 F.Supp. 985.

Moise S. Steeg, Jr., New Orleans, La., Victor A. Sachse, Baton Rouge, La., Fernando J. Freyre, for plaintiffs.

Bernard J. Caillouet, Lancelot P. Olinde, H. H. Hillyer, Jr., New Orleans, La., for defendant.

RUBIN, District Judge:

## FINDINGS ON MOTION FOR SUMMARY JUDGMENT

For reasons set forth in the attached memorandum opinion, the motion for summary judgment is GRANTED in part and DENIED in part. However, in accordance with the provisions of Rule 56(d) of the Federal Rules of Civil Procedure, the Court has examined the pleadings and the evidence before it and has interrogated counsel to ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. The following facts appear to be without material controversy, and upon trial of this action, they will be deemed established:

1. Humble Oil & Refining Company ("Humble) is the present lessee under the mineral lease originally granted to I. R. Price, as lessee, a copy of which is annexed to the plaintiffs' complaint ("The Lease").

2. In 1933, the Federal Land Bank of New Orleans granted The Lease to I. R. Price, one of the plaintiffs in this suit. Price was a lease broker and was acting as agent for Humble. The property affected by The Lease is referred to as The Williams Property.

3. The Lease was on a printed form and contained provisions then in common use.

4. The Federal Land Bank was a large landowner, and employed experienced persons to look after its mineral interests. In addition, it had available the advice of a lawyer regularly employed by it.

5. Humble paid Price 2 years rentals in advance and, by the use of this prepayment, Price succeeded in getting the Land Bank to sell The Williams Property to the Williams family, from whom it had acquired the property.

6. The Land Bank reserved a quarter interest in the minerals.

7. Price assigned The Lease to Humble.

8. The Williams family granted Price and another plaintiff, Edwin F. Gayle, a mineral interest in The Williams Property for their services.

9. Humble drilled a well on The Williams Property in 1937. This was the discovery well in the North Crowley field, and it is known as Williams No. 1.

10. Humble drilled additional wells on The Williams Property in a surface spacing pattern containing approximately 20 acres per well.

11. Production of oil and gas from The Williams Property or from premises pooled with them is still continuing.

12. The plaintiffs and others who share in the royalties payable under The Lease have received payments from the date of first production to March 1, 1964, of more than $1,274,000.

13. As of March 1, 1964, Humble had drilled 20 wells on The Williams Property at a cost of more than $2,750,000.

14. The plaintiffs' claims in this suit relate only to sands located above the Frio ("The Shallow Sands").

15. In 1963, Humble applied to the State Conservation Department for units affecting The Shallow Sands and unitization orders were issued pooling The Williams Property with other lands as to certain reservoirs in The Shallow Sands effective April 1, 1964.

16. As of March 1, 1964, Humble had performed at least 46 workover operations on wells on The Williams Property producing from The Shallow Sands; these cost more than $1,000,000.

17. There are two unit wells or units in which portions of The Williams Property are pooled situated on adjoining premises within 150 feet of the leased premises. There is no other well on adjoining premises situated within 150 feet of the leased premises.

18. The plaintiffs do not contend that Humble should have drilled an additional well or wells on The Williams Property in order to prevent drainage of oil and gas from beneath the surface of these premises by wells drilled by Humble on adjacent properties. However, the plaintiffs contend that, if Humble had completed an existing well or wells on The Williams Property to another sand or sands in addition to the one from which that well was already completed, in order to prevent drainage of oil and gas from beneath the surface of The Williams Property by wells drilled by Humble on adjacent properties, Humble could have expected to receive a reasonable profit above the additional cost of effecting the additional completion.

The following conclusions of law have been reached by the Court and shall be applied in the conduct of the trial:

1. In order for the plaintiffs to recover damages from the defendant because of a breach of the defendant's implied obligation as lessee to exercise reasonable diligence to prevent drainage of minerals from beneath the surface of the leased premises, the plaintiffs must establish by a preponderance of the evidence that oil or gas could have been produced from the same reservoirs as those from which production was actually obtained through wells drilled on other property, that this could have been accomplished by additional or offset completions effected from wells already drilled on the leased premises, and that it would have been economically feasible for the lessee to effect such additional completions.

2. The burden of proof is on the plaintiffs to establish the damages sustained by them by showing by a preponderance of the evidence the quantity of oil and gas that would have been produced from the offset completions and the value of the minerals that plaintiffs would have received from that production had the offset completions been timely effected.

3. If the plaintiffs have a claim, it is only for damages, and the plaintiffs are not entitled to an accounting. Therefore, summary judgment should be granted in favor of the defendant on the plaintiffs' first cause of action.

4. This suit is not barred as a matter of law by the plaintiffs' failure to give notice of breach or notice of default. Whether or not it is barred is a question of fact to be decided by the jury.

5. A mineral lessee has a duty to the mineral lessor to act as a prudent administrator of the leased premises. If the lessee is draining oil or gas from beneath the leased premises by a well drilled by the lessee on other property, its duty to act as a prudent administrator may include an implied obligation to unitize the leased premises with those from which production is being obtained, or to drill an offset well, or to effect an offset completion of a well already drilled on the leased premises, if these acts are economically feasible under the principles set forth in paragraph 1, above or to do those other things, if any, that a prudent administrator would do under the circumstances. What action a prudent administrator would take under the circumstances is a factual question to be decided by the

finder of fact in the light of the relevant evidence.

These conclusions of law are more fully set forth in the attached opinion and are reached for the reasons and under the authorities set forth therein.

There being no just reason for delay, summary judgment is granted in favor of the defendant on the plaintiffs' first cause of action. The defendant's motion for summary judgment on the issue of notice as a prerequisite to this action is denied.

## REASONS FOR SUMMARY JUDGMENT

The plaintiffs seek an accounting and, in the alternative, damages, for breach of Humble's implied obligation as a mineral lessee to exercise reasonable diligence to prevent the drainage of oil and gas from beneath their property. The principles to be applied in this diversity suit are determined by the law of Louisiana. Williams' prospects of recovery in federal court, like Tompkins', are the same as those he would have in state court. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

## I. ACCOUNTING

The plaintiffs' first cause of action alleges that the plaintiffs wrote a letter on March 29, 1963, demanding payment of $1,226,000.00 for oil drained from The Williams Property by wells drilled by Humble on adjacent property, and that Humble replied denying "substantial drainage." The plaintiffs conclude that this admits that some drainage occurred and that they thereby became entitled to an accounting. But even if the plaintiffs' premises are correct, their conclusion is a non sequitur. Even if liability is established because Humble's letter is read as admitting "insubstantial drainage," the plaintiffs' claim, under Louisiana law, is one for damages. They have no right to an accounting.

■ By judicial improvisation, relying largely upon the analogy to principles of lease and servitude, Louisiana's courts have evolved a body of rules applicable to an industry unknown when the Civil Code was adopted. The shaping of the basic precepts began almost 50 years ago. In 1922 Louisiana's Supreme Court held that a landowner does not own the oil and gas beneath his property. Frost-Johnson Lumber Co. v. Salling's Heirs, 1922, 150 La. 756, 91 So. 207. He has the exclusive right to search for minerals and to reduce them to his possession. But only upon taking possession does he become vested with ownership.[1] This rule has since been consistently applied. Although it has been indicated that a wilful or negligent interference with the landowner's right to attempt to reduce minerals to his possession might create a cause of action,[2] the rule that minerals do not belong to the owner of the surface until he reduces them to his possession has never been qualified.[3] The supposed fugacious quality of oil and gas has led the Louisiana courts to conclude that the owner of a tract of land cannot claim the oil or gas produced by a neighbor as a result of drainage from his property.[4] Enactment of the conservation law has not changed this "rule of capture."[5]

1. Frost-Johnson Lumber Co. v. Salling's Heirs, 1922, 150 La. 756, 91 So. 207; Liles v. Texas Co., 1928, 166 La. 293, 117 So. 229; Wright v. Imperial Oil & Gas Products Co., 1933, 177 La. 482, 148 So. 685.

2. McCoy v. Arkansas Natural Gas Co., 1932, 175 La. 487, 143 So. 383, 85 A.L.R. 1147.

3. Adams v. Grigsby, La.App., 1963, 152 So. 2d 619; Whitehall Oil Co. v. Heard, La.App., 1967, 197 So.2d 672.

4. Higgins Oil & Fuel Co. v. Guaranty Oil Co., 1919, 145 La. 233, 82 So. 206; Louisiana Gas & Fuel Co. v. White Bros., 1925, 157 La. 728, 103 So. 23; Breaux v. Pan American Petroleum Corp., La. App., 1964, 163 So.2d 406.

5. The Louisiana cases that have dealt with the problem of drainage since the adoption of the existing conservation statute have continued to follow the "rule of capture." See, e. g., Breaux v. Pan American Petroleum Corp., La.App., 1964, 163 So. 2d 406; Whitehall Oil Co. v. Heard, La. App., 1967, 197 So.2d 672.

The principles fixed by the Louisiana jurisprudence were summed up by the Louisiana Court of Appeal for the Third Circuit in Breaux v. Pan American Petroleum Corp., La.App., 1964, 163 So.2d 406, as follows:

"It is well settled in Louisiana that oil and gas in place are fugitive minerals which are not subject to absolute ownership as specific things apart from the soil. The owner of land does not own the fugitive oil or gas beneath it so as to have the right to follow it after it has left his land, but he does have the right to drill on his land and to become the owner of such oil and gas as he may thereby draw through the soil and bring into his possession." 163 So.2d at 409.

██ *Breaux* squarely holds that the right of the landowner-lessor against his lessee in the event of a breach of the lessee's implied obligation to exercise reasonable diligence to prevent drainage is a right to recover damages. A creditor, as such, has no right to an accounting in Louisiana. Where Louisiana courts have recognized an action for an accounting, they have done so under the provisions of Louisiana Civil Code Article 21, which provides:

"In all civil matters, where there is no express law, the judge is bound to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent."

The plaintiffs claim that Humble violated an implied term of its contract with them. The *Breaux* case makes it clear that they can recover only such damages as they can prove. They are not entitled to an accounting.[6] Therefore, the motion for a summary judgent as to the first cause of action will be granted.

## II. EXPRESS OBLIGATION TO DRILL OFFSET WELLS

Humble urges it does not owe the plaintiffs an implied obligation to effect additional completions of existing wells because The Lease contains an express provision relating to offset wells, reading as follows:

"In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within one hundred fifty (150) feet of and draining the leased premises, Lessee agrees to drill such offset wells as a reasonable prudent operator would drill under the same or similar circumstances."

Humble contends that this supersedes any implied obligation. Other than two unit wells, the units of which include portions of The Williams Property, no well has been brought in on adjacent land within 150 feet of the leased premises. Hence, Humble urges that, since the contract is the law between the parties,[7] the inclusion of this express obligation to drill offset wells under some circumstances precludes the implication of a different or more extensive obligation.[8]

The Lease clearly obliges Humble to drill offset wells under some circumstances; it does not expressly negate any obligation on the part of the Lessee to protect The Williams Property from drainage under other circumstances. It does not deal with the question of the lessee's obligation to protect the leased premises from drainage by wells on property that may not be adjacent, or with whether the lessee has an obligation to prevent drainage by means other than drilling offset wells, for example, by dual completion of existing wells or unitization proceedings, or with any duty

---

6. That plaintiffs themselves seek a jury trial is not controlling, but a suit for an accounting is not one cognizable by a jury at common law under the principles recognized in the Seventh Amendment.

7. Art. 1901, LSA–C.C.; Billeaud Planters, Inc. v. Union Oil Co. of California, 5 Cir., 1957, 245 F.2d 14.

8. Foster v. Atlantic Refining Co., 5 Cir., 1964, 329 F.2d 485 (Texas).

that may be imposed on the lessee when the lessee itself is causing the drainage.[9]

Courts in other states have held that even though a mineral lease contains an express provision dealing with a subject, an obligation that would otherwise be legally implied as part of the contract will be enforced to the extent that the express and the implied obligation are not inconsistent.[10]

In Louisiana, the mineral lease has been interpreted in the light of the provisions of the Louisiana Civil Code relating to predial leases.[11] It is not to be read within its four corners: it contains implied obligations on the part of both lessee and lessor.[12] The mineral lessee, like other lessees, undertakes the obligation imposed by Louisiana Civil Code Article 2710 "To enjoy the thing leased as a good administrator, according to the use for which it was intended by the lease." [13]

These words are no hollow invocation. They imply basic obligations of the lessee arising, as the caption to the Code article tells us, "from the nature of the contract" of lease. The original French text used in the Codes of 1808 and 1825 is even more graphic: the lessee is bound to enjoy the thing leased as "bon pére de famille * * *."

The Louisiana courts have found that certain obligations are implied from the mineral lease.[14] They have not, however, clearly indicated the conceptual basis for imposing those obligations but have apparently reached this conclusion, at least in part, because of the influence of decisions in common law states. Civilian doctrine would draw all of these implied obligations from the basic duty to enjoy the thing leased as a good administrator.[15]

Viewed in this light, the lessee's duty to act as a good administrator is not a separate and distinct obligation imposed in addition to the implied obligations announced by the Louisiana courts: it is the basic obligation of the lessee and all of the implied obligations already drawn are merely elaborations or reflections of it.

Planiol, a French commentator to whom Louisiana courts have frequently turned for interpretation of the Civil Code articles derived from French sources, says the lessee is required to use the thing leased in the same manner as a prudent owner would use his own property. In describing the obligation he says:

"For example, if it is a horse which is leased, the lessee should avoid tiring him, to take it on too long a journey or make it pull too heavy loads; he should care for and nourish it suitably. If it is cultivated land, he should keep it in good condition; if it is a vineyard, give it the care that vines demand, etc. See Art. 1766. The lessee should not, therefore,

9. Phillips Petroleum Co. v. Millette, 1954, 221 Miss. 1, 72 So.2d 176, 74 So.2d 731.

10. Hartman Ranch Co. v. Associated Oil Co., 1937, 10 Cal.2d 232, 73 P.2d 1163; Stanolind Oil & Gas Co. v. Christian, Texas, 1935, 83 S.W.2d 408. See also, Merrill, Implied Covenants in Oil and Gas Leases, (2d ed. 1940) § 6 at 27; Note, 1967, Remedies for Breach of Implied Covenants in Oil and Gas Leases in Montana, 28 Mont.L.Rev. 187.

11. "The rule is equally well established that in construing mineral leases, ' * * * the codal provisions applicable to ordinary leases must be applied.' " Melancon v. Texas Co., 1956, 230 La. 593, 613, 89 So.2d 135, 142. Coyle v. North American Oil Consolidated, 1942, 201 La. 99, 9 So.

2d 473; Tyson v. Surf Oil Co., 1940, 195 La. 248, 196 So. 336.

12. Pipes v. Payne, 1924, 156 La. 791, 101 So. 144; Reagan v. Murphy, 1958, 235 La. 529, 105 So.2d 210; Breaux v. Pan American Petroleum Corp., La.App., 1964, 163 So.2d 406, cert. denied, 246 La. 581, 165 So.2d 481.

13. Simmons v. Pure Oil Co., 1961, 241 La. 592, 129 So.2d 786.

14. See, e. g., Coyle v. North American Oil Consolidated, 1942, 201 La. 99, 9 So.2d 473, finding an implied obligation to drill offset wells.

15. See Walker, "Implied Drilling Obligations in Oil and Gas Leases in Louisiana," 1 Loyola L.Rev. 1 (1941).

while using the thing according to its destination, make an abusive use of it, such as would compromise its good condition or even its existence."

■ The fundamental purpose of the mineral lease—"the use for which it was intended by the lease"—is the production of minerals.[16] Once production commences, the lessor is paid rent[17] for the leased premises only by the royalty reserved in the lease. It is therefore the duty of the lessee, necessarily implied in the lease, to develop the leased premises properly and to prevent drainage of oil and gas from beneath it, not at all hazards and all costs, but "as a good administrator,"[18] just as it is the obligation of a lessee enjoying a store under a percentage rental to operate the store with regard to the lessor's interests as well as its own.[19]

These basic concepts guide Louisiana courts in reading the entire lease, as well as in determining what additional obligations are implied in it. No Louisiana cases appear to have considered whether an express clause that imposes certain specific obligations relative to offset wells supersedes any other obligation to protect the leased premises from drainage on the part of the lessee. In Wilkins v. Nelson, 1926, 161 La. 437, 108 So. 875, the court sustained an exception of no cause of action to a petition to cancel a lease for failure to protect the premises from drainage on the basis that no violation of an express covenant similar to the one involved here was shown, but the court did not discuss whether there was an implied obligation that went further than the express clause. However, it did hint at recognition of an additional implied obligation for it said that the petition did not allege "that defendant has acquired the lands adjacent to his lease, and within [the limits fixed by the lease that would require the lessee to drill] in an effort to defeat his obligation to develop the property for oil, in the event an oil well should be drilled within that distance from the property leased." 108 So. at 876. Nor does Hart v. Standard Oil Co., 1920, 146 La. 885, 84 So. 169, militate against the existence of an implied obligation where the lease contains an express obligation to drill offsets within a prescribed distance (there, "as is customary in the Caddo field"), for the Court observed in *Hart*, "The testimony of men of experience in the business shows that the well could not have drained plaintiff's land, and therefore did not call for an offset well," and added, "There is ample proof, too, that the custom in the Caddo oil field did not demand that a well of that capacity and at that distance should have been offset."[20]

The jurisprudence of other states points up the reluctance with which courts will hold that the express covenant to drill certain offset wells negates the implied covenant to protect the leas-

---

16. McDonald v. Grande Corp., La.App., 1962, 148 So.2d 441.

17. Louisiana courts have often characterized the lessor's royalty as rent. See, e. g., Roberson v. Pioneer Gas Co., 1931, 173 La. 313, 137 So. 46; Robinson v. Horton, 1941, 197 La. 919, 2 So.2d 647; Davis v. Laster, 1962, 242 La. 735, 138 So.2d 558, 96 A.L.R.2d 332.

18. In connection with the powers granted the lessee by a pooling clause, the Louisiana Court of Appeal for the Third Circuit said, in McDonald v. Grande Corp., La.App., 1962, 148 So.2d 441, 449, "As indicated by the cited cases, the jurisprudence in Louisiana and in other states interprets the powers granted the lessee by a voluntary pooling clause as subject to such restrictions as will prevent arbitrary and unfair dealings and as will therefore enforce a 'standard of good faith' on the part of the mineral lessee."

19. Selber Bros. v. Newstadt's Shoe Stores, 1943, 203 La. 316, 14 So.2d 10. See also The Work of the Louisiana Appellate Courts for the 1962–63 Term, Mineral Rights, 24 La.L.Rev. 215, 218 (1964); The Work of the Louisiana Appellate Courts for the 1961–62 Term, Mineral Rights, 23 La.L.Rev. 323, 336 n. 40, 338 (1963) in which reference is made to "increasing utilization of what might be termed a fiduciary principle in oil and gas law."

20. 84 So. at 170.

ed premises from drainage. In some cases, courts have held that the express obligation applies only until the first well is drilled on the leased premises or until the end of the primary term and have applied the implied covenant thereafter.[21] In Millette v. Phillips Petroleum Co., 1950, 209 Miss. 687, 48 So.2d 344, although the court said that the express offset provision precluded equitable relief so far as an implied duty to drill offset wells was concerned, the court held that the lessee's "equitable duty, existing as well under implication, to conserve the mineral resources of lessors or to refrain from depletory acts survives unimpaired." 48 So.2d at 347.

The effect of an express offset covenant on the implied duty to protect from drainage is fully considered by Professor Charles J. Meyers of the Stanford University Law School in "The Effect of Express Provisions in an Oil and Gas Lease on Implied Obligations," Fourteenth Annual Mineral Law Institute 90, 107 (1967). He states:

"I think the courts that are troubled by the express offset covenant are justified in their concern. While the logic of the express clause is inescapable, many landowners have something less than perfect command of logic. If you know nothing at all about implied covenants, even a careful reading of a lease form containing an express offset clause would suggest that the lessee is assuming an affirmative, extra undertaking; when in fact he is shucking off responsibility that he would otherwise have. I am therefore inclined to think that courts ought not to treat the express covenant as negating the implied covenant.

"When the offset distance is fixed at a figure shorter than that permitted by the spacing rules I am even more certain that the express clause should not be given pre-emptive effect. * * * Thus if the lease states that no protective wells will be drilled to offset draining wells beyond 650 feet or that no protection wells will ever be drilled on said leasehold, the courts should enforce the provision to the fullest. But courts should not enforce clauses having the effect of the foregoing but suggesting to the innocent just the opposite. The courts should be unmasking the wolf, not helping him keep his sheep's clothing neatly in place." Id. at p. 110.

■ Guided by the usual principles that determine a lessor's duty, the Louisiana courts, I think, would not hold that inclusion of the limited express requirement of drilling offset wells contained in The Lease negates any other obligation by the lessee to protect the leased premises from drainage. Humble suggests that, while this express covenant "might be thought to be severe," it was customary when the lease was prepared, the lease price was fair, and it was only 30 years later that a breach was alleged. This argument fails to take adequately into account the fundamental nature of the contract of the lease: taken at face value it would negate almost every implied obligation.

■ It does not devitalize the lease to say that the fundamental duties imposed on the parties to a lease by the very nature of their contract must be interpreted in the light of changes in technology and industry practices. What was diligent development in 1933, when wells were customarily drilled to a relatively shallow depth, is obviously not diligent development in 1967 when many wells are successfully drilled at depths

---

21. Chapman v. Sohio Petroleum Co., Tex. Civ.App., 1956, 297 S.W.2d 885; Coats v. Brown, Tex.Civ.App., 1957, 301 S.W.2d 932; Magnolia Petroleum Co. v. Page, Tex.Civ.App., 1940, 141 S.W.2d 691. But see Hutchins v. Humble Oil & Refining Co., Tex.Civ.App., 1942, 161 S.W.2d 571, the express offset provision was held to be the sole obligation of the lessee concerning the protection of the leased premises from drainage. This case has been severely criticized by commentators. See, e. g., Merrill, Implied Covenants in Oil and Gas Leases, § 6, n. 11; Meyers, The Effect of Express Provisions in an Oil and Gas Lease on Implied Obligations, Fourteenth Annual Mineral Law Institute 90 (1967).

in excess of 15,000 feet. It does not alter the contract to hold, as I think the courts of Louisiana would, that the lessee's implied obligations are to be interpreted in the light of the technological methods that are now economically feasible, not in the light of industrial practices 35 years ago.

## III. THE NATURE AND EXTENT OF THE LESSEE'S IMPLIED OBLIGATION

It must be assumed, then, that the lessee does have an implied obligation to protect The Williams Property from drainage and that this obligation is not limited to drilling offsets to wells within 150 feet of the leased premises. But Humble urges that, if there is such a duty, the mineral lessee's implied duty to its lessor with respect to avoiding drainage is no different whether the drainage is caused by a third party or by the lessee itself. In either event the duty, it argues, is merely to drill offset wells under the same circumstanc-

es that would require any prudent operator of the leased premises to drill such wells. On the other hand, the plaintiffs argue that the lessee's implied duty to protect the lessor's premises from drainage includes an obligation to reimburse the lessor for drainage occasioned by the lessee even when the lessee could not have profitably brought in production on the leased premises.[22]

A number of courts in other states have considered this problem, but there is no agreement on its solution. Professor George W. Hardy, III, Professor of Mineral Law at the Louisiana State University Law School, has written:[23]

"Some cases have apparently considered of little or no significance the fact that the lessee of the complaining lessor is causing the drainage.[24] Others have categorically denied that there is any significance attaching to this fact.[25] Still others have suggested the existence of a higher duty on the part of the lessee causing drainage by wells

22. Phillips Petroleum Co. v. Millette, 1954, 221 Miss. 1, 72 So.2d 176, 74 So.2d 731.

23. Hardy, Drainage of Oil & Gas from Adjoining Tracts—A Further Development, 1966, 6 Natural Resources Journal 45, 52–53.

24. Professor Hardy's footnote reads:
"Billeaud Planters, Inc. v. Union Oil Co., 245 F.2d 14 (5th Cir. 1957); Gerson v. Anderson-Prichard Prod. Corp., 149 F.2d 444 (10th Cir. 1945); Cooper v. Ohio Oil Co., 108 F.2d 535 (10th Cir. 1939); Arkansas Natural Gas Corp. v. Pierson, 84 F.2d 468 (8th Cir. 1936); Hamilton v. Empire Gas & Fuel Co., 297 F. 422 (8th Cir. 1924); Clear Creek Oil & Gas Co. v. Brunk, 160 Ark. 574, 255 S.W. 7 (1923); Powers v. Bridgeport Oil Co., 238 Ill. 397, 87 N.E. 381 (1909); Myers v. Shell Petroleum Corp., 153 Kan. 287, 110 P.2d 810 (1941); Leeper Oil Co. v. Rowland, 239 Ky. 295, 39 S.W. 2d 486 (1931); Hood v. Southern Prod. Co., 206 La. 642, 19 So.2d 336 (1944); Deep Rock Oil Corp. v. Bilby, 199 Okla. 430, 186 P.2d 823 (1947); Chapman v. Sohio Petroleum Co., 297 S.W.2d 885 (Tex.Civ.App.1956); Sinclair Oil & Gas Co. v. Bryan, 291 S.W. 692 (Tex.Civ. App.1927). These and other cases are

cited and discussed in 5 Williams & Meyers §§ 831–32.2, pp. 212–23."

25. Professor Hardy's footnote reads:
"Monsanto Chem. Co. v. Andreae, 245 Miss. 11, 147 So.2d 116 (1962); Hutchins v. Humble Oil & Ref. Co., 161 S.W.2d 571 (Tex.Civ.App.1942). In Monsanto Chem. Co. v. Sykes, 245 Miss. 207, 147 So.2d 290 (1962), on suggestion of error 247 Miss. 227, [sic, correct citation, 247 Miss. 207], 149 So.2d 20 (1963), relief was denied even though the defendant lessee was causing the drainage. However, it appeared that some $483,000 had been expended to drill and rework the protection well which could not be put in production. The court regarded this as due diligence in protecting the premises. This case does not really seem to be one denying that there is any significance to be attached to the fact that the lessee caused the drainage. Rather, it turns on a simple absence of sufficient proof demonstrating that the defendant had not acted as a prudent operator. Both of the *Monsanto* cases, *supra*, impose limitations on the prior decision of Phillips Petroleum Co. v. Millette, 221 Miss. 1, 72 So.2d 176 (1954), in which the Mississippi court had adopted the concept of 'fraudulent drainage.'"

on adjoining land.[26] In seeming recognition of the higher duty, these latter cases have either relaxed the requirement of proof that an offset well be profitable,[27] or negated the effect of an express offset clause freeing the lessee from any duty to drill an offset well,[28] or declared that acceptance of delay rentals with knowledge of the drainage does not waive the lessor's right to seek relief."[29]

But the commentators are no more able to reach consensus than the courts. Professors Merrill[30] and Williams and Meyers[31] criticize the notion that a lessee who itself causes drainage has any greater obligation than if the drainage were caused by a third person. Professor Seed suggests that a separate and distinct implied obligation to refrain from depletory acts should be imposed on the lessee.[32] Professor Hardy sees a "strong need for some sanction to inhibit a lessee from abusing his position of advantage and succumbing to the temptation to indulge his interest at the expense of one of his lessors."[33]

In Louisiana the question is no longer an open one. The issue was directly considered in Breaux v. Pan American Petroleum Corp., La.App., 1964, 163 So. 2d 406. The court concluded that the lessor has "no greater rights and no different cause of action against defendants-lessees simply because the defendants are also the lessees of the adjoining tract of land on which the alleged draining well is located." 163 So.2d at 417. The court thoroughly considered the prior Louisiana jurisprudence in reaching this reasoned conclusion. Nor is the Breaux decision based on technicalities of pleading as plaintiffs suggest. The Louisiana Supreme Court not only denied a writ of certiorari to the lessor, but said of the Court of Appeal's judgment, "We find no error of law in the judgment

26. Professor Hardy's footnote reads:
"Olsen v. Sinclair Oil & Gas Co., 212 F.Supp. 332 (D.Wyo.1963); Geary v. Adams Oil & Gas Co., 31 F.Supp. 830 (E.D.Ill.1940); Blair v. Clear Creek Oil & Gas Co., 148 Ark. 301, 230 S.W. 286 (1921), Annot., 19 A.L.R. 430 (1922); Hartman Ranch Co. v. Associated Oil Co., 10 Cal.2d 232, 73 P.2d 1163 (1937); R. R. Bush Oil Co. v. Beverly-Lincoln Land Co., 69 Cal.App.2d 246, 158 P.2d 754 (1945); Hughes v. Busseyville Oil & Gas Co., 180 Ky. 545, 203 S.W. 515 (1918) (dictum); Central Kentucky Natural Gas Co. v. Williams, 249 Ky. 242, 60 S.W. 2d 580 (1933) (dictum); Phillips Petroleum Co. v. Millette, supra note 21; Millette v. Phillips Petroleum Co., 209 Miss. 687, 48 So.2d 344 (1950); Dillard v. United Fuel Gas Co., 114 W.Va. 684, 173 S.E. 573 (1934); Trimble v. Hope Natural Gas Co., 113 W.Va. 839, 169 S.E. 529 (1933); Adkins v. Huntington Dev. & Gas Co., 113 W.Va. 490, 168 S.E. 366 (1932). These and other cases are collected and discussed in 5 Williams & Meyers, §§ 824–24.2, pp. 125–48."

27. Professor Hardy's footnote reads:
"Geary v. Adams Oil & Gas Co., supra note 22; R. R. Bush Oil Co. v. Beverly-Lincoln Land Co., supra note 22; Phillips Petroleum Co. v. Millette, 221 Miss. 1, 72 So.2d 176 (1954); Adkins v. Huntington Dev. & Gas Co., supra note 22.

These cases are collected and discussed in 5 Williams & Meyers 127."

28. Professor Hardy's footnote reads:
"R. R. Bush Oil Co. v. Beverly-Lincoln Land Co., 69 Cal.App.2d 246, 158 P.2d 754 (1945); Millette v. Phillips Petroleum Co., 209 Miss. 687, 48 So.2d 344 (1950). See discussion in 5 Williams & Meyers 128."

29. Professor Hardy's footnote reads:
"Blair v. Clear Creek Oil & Gas Co., 148 Ark. 301, 230 S.W. 286 (1921); Trimble v. Hope Natural Gas Co., 133 W.Va. 839, 169 S.E. 529 (1933). Other cases have refused to apply other express lease clauses in situations where the drainage complained of is caused by the defendant lessee. For a full discussion of these cases, see 5 Williams & Meyers 128–29."

30. Merrill, Implied Covenants in Oil and Gas Leases § 111 at 260 (2d ed. 1940).

31. 5 Williams & Meyers Oil & Gas Law § 824.2, at 144–47 (1964).

32. Seed, The Implied Covenant in Oil & Gas Leases to Refrain from Depletory Acts, 3 U.C.L.A.L.Rev. 508 (1956).

33. Hardy, Drainage of Oil and Gas From Adjoining Tracts—A Further Development, 1966, 6 Natural Resources Journal 45, 57.

complained of." [34] It is therefore clear that the opinion in *Breaux* does not represent merely a quaint application of Louisiana procedural rules. Judge Tate's dissent from the denial of rehearing urged this view and argued that the case should have been remanded to permit the lessor to amend the pleadings.[35] But the court had already said that the evidence in the record supported the conclusions reached by the trial judge and by it and that the evidence, together with the pleadings, was simply not enough to show that the lessors were entitled to recover on the merits. There was therefore no reason to remand for amendment to the pleadings.

■ The *Breaux* case makes the conclusion irresistible, as a matter of Louisiana law, that the plaintiffs cannot recover here for breach of the implied obligation to protect the leased premises from drainage unless they can show: (1) that substantial damage has occurred, (2) that the lessee could have prevented the drainage without sustaining an economic loss and (3) the amount of royalties that the landowner would have received had the lessee taken appropriate preventive measures.

## IV. NOTICE REQUIREMENTS

Humble next contends that the plaintiffs' suit is barred for failure to give notice of default in accordance with the terms of The Lease because Paragraph 8 of The Lease provides in part:

"And in the event Lessor considers that operations are not being conducted in compliance with this contract, Lessee shall be notified in writing of the facts relied upon as constituting a breach hereof and Lèssee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument."

Humble contends that the decisions in Billeaud Planters, Inc. v. Union Oil Co. of California, 5 Cir., 1957, 245 F.2d 14, 18, and Bollinger v. Republic Petroleum Corp., La.App., 1967, 194 So.2d 139, cert. denied, 250 La. 463, 196 So.2d 276, barring any suit until such a notice is given, control here. But the lease in *Billeaud* provided expressly with respect to "all [lessee's] obligations hereunder, *both express and implied*," and the words emphasized were stressed in the court's opinion to indicate the importance the Fifth Circuit placed on them. In addition the lease involved there expressly stated that notice was a "condition precedent to *any action by Lessor for any cause hereunder*." (Emphasis supplied.) Similarly the notice clause in the lease involved in *Bollinger* applied "in the event Lessor considers that Lessee has failed to comply with one or more of its obligations hereunder, either expressed or implied," with respect to all "claims Lessee has *breached this lease*."

Here, however, the notice clause does not refer to implied obligations; it merely deals on its face with claims that "operations are not being conducted in compliance with this contract;" and it gives sixty days after receipt of notice "to comply with the obligations imposed by virtue of this instrument."

These differences in language may signify a profound difference in intention. But a jury might find that the parties intended the words in the present lease to mean precisely the same thing they meant by the different words used in the leases involved in *Bollinger* and *Billeaud*.

---

34. Breaux v. Pan American Petroleum Corp., 1964, 246 La. 581, 165 So.2d 481.
   The plaintiffs' application to the Louisiana Supreme Court for a writ of certiorari expressly urged, "The Court erred in failing to remand the case to permit plaintiffs to supply the allegations as to the money value of the oil and gas drained (the amount of which was set out in the petition) ; and/or to supply the allegation that defendants could have had formed a forced pooling unit, and did not do so (the petition states that nothing was done to protect plaintiffs)."

35. 163 So.2d at 425.

Courts sitting as triers of fact resolve such questions themselves.[36] Here the jury must determine it. Should the jury find as a fact that it was the intention of the parties that notice is a requisite to this particular kind of suit, and should it be established that no notice was given, then presumably the verdict would be for the defendants. If, however, the jury finds that the clause does not apply here, then it would be necessary to determine whether notice was nonetheless a requisite under Articles 1931 and 1933 of the Louisiana Civil Code because the breach was passive. It is not necessary to determine at this moment whether the classification of a specific breach as active or passive is a question of law or a question of fact. However, it appears that the proper way to handle the issue ultimately will be for the court to define the terms "active" and "passive" for the jury and then require the jury to determine whether, under the facts proved, the breach (if there was one) was of one kind or the other.[37]

The lessors have suggested that, even if notice would otherwise have been required as a matter of law, Humble should be precluded from asserting that defense here because it was Humble's duty to provide them with the information on the basis of which they could have acted either to give notice or to seek unitization of the leased premises.

Humble argues that it is the duty of the lessor to maintain some contact with the premises and know what is occurring.

It urges that the lease may, and that this lease does, require the lessor "to exercise a prudent supervision of the performance by the lessee so that, if in the lessor's opinion operations are not conducted by the lessee in accordance with the lease, the lessor may make formal written complaint and require immediate corrective action." It suggests that records available to the plaintiffs at the Louisiana Conservation Commission would have disclosed all that plaintiffs needed to know in order to give notice of breach had they wished to do so.

The plaintiffs contend that it was not their duty to examine the Conservation Commission records but that, in any event, Humble filed erroneous information with the Commission and that they could not have acted effectively on the basis of information available to them.

These contentions likewise involve questions of fact. Before they can be reached, the notice issue must be determined. If the jury finds that it was the plaintiffs' duty to give notice of a breach either because the lease required it, or because the lease did not deal with the subject and the breach was passive,[38] then the next issue will be whether, under the facts proved, Humble is precluded from enforcing the duty that would otherwise exist.

There is yet another question invoked in this aspect of the case. Louisiana courts have long held that notice of default is not required where it would have been vain to give such notice.

---

36. The court in *Billeaud* said such a breach was passive. It appears that this observation was obiter dictum because having held the notice clause applicable to both express and implied obligations (which would include active as well as passive breaches) it was unnecessary to reach the issue. See Professor Hardy's Note on *Billeaud* in 1958, 18 La.L.Rev. 354, 357. In addition we note that its attention was focused on the failure to drill an offset well, not on the affirmative act of drainage. In any event the court did not deal with the function of judge and jury in such cases because the case had been tried by the district court without a jury. *Bollinger* likewise was a nonjury case.

37. Article 1912 of the La. Civil Code tells us, "it is a prerequisite to the recovery of damages and of profits and fruits" that a party who is charged with a breach of contract be put in default. A contract may be violated "either actively by doing something inconsistent with the obligation it has proposed or passively by not doing what was covenanted to be done." LSA–C.C. Art. 1931. "When the breach has been passive only, damages are due from the time that the debtor has been put in default." LSA–C.C. 1933.

38. Id.

Where the obligee denies the existence of a contract,[39] or where it admits the contract but denies the existence of an obligation under it,[40] it is not necessary for the plaintiff to prove that he put the defendant in default. "The reason for that is that it would be inconsistent for one to deny the obligation of a contract, or to deny that he had violated the obligation, and at the same time urge that a proper demand might have brought forth a performance of the obligation on his part." Louisiana Farms Co. v. Yazoo & M. V. R. Co., 1934, 179 La. 539, 154 So. 445, 446.

On the other hand, a Louisiana court said in Bollinger v. Republic Petroleum Corp., La.App., 1967, 194 So.2d 139, cert. denied, 250 La. 463, 196 So.2d 276, that the giving of notice and observance of the waiting period would not necessarily be a "vain and useless thing" and that the court would not speculate on what the response of the defendant would have been had the notice and delay requirements been complied with.

This issue also does not appear appropriate for decision on motion for summary judgment. The plaintiffs may prove that it would have been fruitless for them to give notice. The defendants may satisfy the jury that such a conclusion is either speculative or wrong. In either event, the decision can be reached only when all of the facts are before the trier of fact.

Humble's motion for summary judgment for failure to give notice or to put in default is therefore denied.

## V. DUTY TO UNITIZE

In defense against the motion for summary judgment, the plaintiffs urge that Humble owed them a duty to unitize the leased premises. Since the motion for summary judgment in this regard has been denied, there is no necessity of ruling on this question in order to dispose of that motion. However, to enable the parties to determine the issues that will be submitted to the jury, I have reached the conclusion of law set forth as Number 5 above under the procedure permitted by Rule 56(d). This requires discussion of the question of whether there is a duty of a lessee who holds adjacent properties under lease to seek unitization in order to protect one property from drainage by another.

In discussing this problem, the opinion in *Breaux* stated, "It is conceivable * * * that the lessor would be entitled to recover damages by alleging and proving that the lessee could have created a pooling unit, thus enabling the landowner to participate in the production from the draining well, but that he failed to do so. But, even on that ground the lessor must establish the value of the minerals which he would have received if such a unit had been timely formed." [41]

The Lease does not contain a pooling clause. The language used by the Court in *Breaux* might however extend to a duty to secure unitization, and at least one commentator, Professor George W. Hardy, III, reads the opinion as strongly intimating this.[42] Another commentator has said:

"The author of the authoritative treatise in this field, Professor Maurice Merrill, has advocated the position that the advent of the conservation laws has brought about the birth of a new implied duty, the duty to 'take such steps as are necessary to qualify him under the regulations, to secure the largest possible allowable,' and that the lessee who has stopped short of the complete exhaustion of all remedies

39. Beck v. Fleitas, 1885, 37 La.Ann. 492; Southern Sawmill Co. v. Ducote, 1908, 120 La. 1052, 46 So. 20; Johnson v. Levy, 1908, 122 La. 118, 47 So. 422; Schramm v. Toye Bros. Yellow Cab Co., La.App., 1936, 169 So. 116.

40. Louisiana Farms Co. v. Yazoo & M. V. R. Co., 1934, 179 La. 539, 154 So. 445;

Wadkins v. Wilson Oil Corp., 1942, 199 La. 656, 6 So.2d 720.

41. 163 So.2d at 415.

42. Hardy, Drainage of Oil and Gas From Adjoining Tracts—A Further Development, 6 Natural Resources Journal 45 (1966).

toward this end and who has not performed all necessary administrative acts to secure prudent development has not discharged his duties to the lessor. Arguments supporting this fifth implied covenant are that the exclusiveness of the lessee's operating rights, and its access to most of the pertinent data relating to the leased minerals, render him the only person qualified to represent the interests of the owner in matters pertaining to production of minerals from the land. Although considerable controversy surrounds this new obligation of the lessee, it has been judicially accepted in a few states." (Footnotes omitted)[43]

The implied obligation of the lessee to protect the leased premises from drainage is coupled with his obligation to use them as a prudent administrator; hence there may be an obligation on the part of the lessee who is producing from adjacent property to take some action once it learns, as it alone best knows, that it is draining oil or gas from premises that it has a duty to protect. The lessee might conceivably discharge its duty to act as a prudent administrator in various ways. It might drill an offset well or effect an additional completion of an existing well. If it thinks either that this is inadvisable under the circumstances or that it cannot be done profitably, it might have a duty to seek unitization. If it does not, then the facts may indicate that a prudent administrator would make full disclosure to the lessor (directly or by filing sufficient information with the Commissioner of Conservation) in order to enable the lessor to take such action on this information as the lessor may deem appropriate, if any, perhaps by seeking unitization,[44] or by giving notice of the breach of the lease if the lessor considers that such a breach has occurred. The nature and extent of the lessee's duties depend entirely on the facts and figures, and on what a prudent administrator in the same position would do.

Consequently, the jury should be charged that the mineral lessee who is leasing adjacent tracts and is producing oil or gas from a well on one tract that drains the other has a duty to act as a prudent administrator in order to protect the owner of the tract being drained by taking such steps as a prudent administrator would take under the circumstances then prevailing. If the lessee has not acted as a prudent administrator, but has persisted in the drainage, then as set forth in the *Breaux* case: "[T]he measure of damages which the lessor sustains because of a breach by the lessee of this implied obligation is the value of the minerals or royalties which the lessor would have received had the lessee complied with his obligation under the lease." [45]

This opinion will serve as an order on the motion for summary judgment.

---

43. George, The Impact of Conservation Laws and Decisions Upon the Mutual Obligations of the Mineral Lease, 1964, 24 La.L.Rev. 571, 576.

44. LSA–R.S. 30:6, subd. F.

45. Breaux v. Pan American Petroleum Corp., La.App., 1964, 163 So.2d 406, 415.